MOTOR TRANSPORT CO. *v.* McCANLESS, COMMISSIONER OF
FINANCE AND TAXATION.

(*Nashville*, December Term, 1944.)

Opinion filed June 30, 1945.

J. G. STEPHENSON, of Nashville, for complainant Motor Transport Co. (appellant).

ROY H. BEELER, Attorney General, and WILLIAM F. BARRY, Solicitor General, for defendant.

MR. JUSTICE NEIL delivered the opinion of the Court.

The complainant filed its original bill in the Chancery Court of Davidson County to recover certain privilege taxes theretofore paid under protest to the defendant as Commissioner of Finance and Taxation of the State of Tennessee. The suit was instituted within the time prescribed by law, Code, section 1790 et seq. The bill alleges that complainant is a Tennessee corporation and is engaged in the business of transporting freight and other commodities within the geographical limits of the State, and was so engaged during the periods for which the privilege. taxes involved were assessed and collected. It is further alleged that the defendant unlawfully assessed and collected three per cent of gross revenues of complainant upon certain commodities which by contract were transported from Memphis, Tennessee, and delivered to certain United States Government reservations, to-wit, Camp Tyson in Henry County, Wolfe Creek Ordnance Plant in Carroll and Gibson Counties, and the United States Army Air Base in Rutherford County, said points of delivery being within the geographical limits of the State of Tennessee.

The commodities referred to herein were the following: Hydrogen cylinders to Camp Tyson, fibrous shell containers from Shelton Canning Company to Wolfe Creek Ordnance Plant, and aviation gasoline to the Army Air Base. The shipment to the last-named point is not now involved, complainant having abandoned its contention with regard to such shipments.

The complainant alleges that the lands upon which Camp Tyson and the Wolfe Creek Ordnance Plant are located were acquired by the United States of America pursuant to Article 1, Section 8, Clause 17, of the Constitution of the United States, and that exclusive jurisdiction was ceded to the United States by the laws of Tennessee, Section 98 of the Code of 1932; that the State had no authority to levy a tax upon articles that were being delivered to these army bases.

The defendant filed an answer denying that the tax had been unlawfully assessed and collected. There was a specific denial that the United States acquired "exclusive jurisdiction" over the areas that were ceded to the federal government. It averred that said taxes were authorized by the General Revenue Bill, Chapter 108, Acts of 1937, as amended, Williams' Code, section 1248.-134, under Item C, which provides for a levy of a privilege tax upon "transportation companies" based upon an amount equal to three per cent of the gross receipts derived from intrastate business done in the State of Tennessee; that the complainant in transporting the commodities involved never departed from the geographical limits of Tennessee.

There was a stipulation by counsel for the respective parties filed with the record. The chancellor after due consideration of the issues dismissed complainant's bill,

and from his decree an appeal was prayed and granted to this Court.

Several errors have been assigned. They all involve the single question which is aptly stated in complainant's brief in the following language: "To again state the question raised under the pleadings . . ., is the hauling of munitions of war from a point in Tennessee, in this case Memphis, Tennessee, to lands acquired by the United States and jurisdiction ceded by the State of Tennessee, an intrastate transaction so as to be subject to the tax imposed under the Revenue Bill in question?"

In the trial court the complainant raised the question that the tax constituted an 'illegal interference with an instrumentality of the federal government." Its contention was based upon *Panhandle Oil Co.* v. *State of Mississippi*, 277 U. S. 218, 48 S. Ct. 451, 72 L. Ed. 857, 56 A. L. R. 583, but, says counsel, "In view of the holding of the court in *State of Alabama* v. *King & Boozer et al.*, 314 U. S. 1, 62 S. Ct. 43, 86 L. Ed. 3, which case apparently overrules the opinion in the *Panhandle Case*, we will not present the question before your honors."

The chancellor, in an exhaustive and able opinion, which is filed with the record, held that the shipments in question did not constitute interstate commerce, but were entirely intrastate, and that complainant could not claim an exemption under our revenue statutes as amended.

We have carefully examined the authorities cited by counsel and, after due consideration, find ourselves in accord with the views expressed in the chancellor's opinion. Moreover, we think the General Act of Cession, here invoked, qualifies the cession of jurisdiction to the federal government. Section 96 of the Code of Tennessee provides:

"Sovereignty is coextensive with boundary.—The sovereignty and jurisdiction of the state is coextensive with the boundaries thereof, but the extent of such jurisdiction over places that have been or may be ceded to. the United States is qualified by the terms of such cession."

Now the cession of the areas at Camp Tyson and the Wolfe Creek Ordnance Plant were effected under the General Act of Cession which qualifies the cession of jurisdiction, Code, section 98, as follows:

". . . and provided, that the state reserves the reversion on abandonment of such use by the United States and the right to tax all property of any railroad, *or other corporation, having a right of way, or location over or upon the said lands.*" (Italics ours.)

■ The defendant insists "that when the property in question was ceded to the United States, the State of Tennessee expressly qualified the jurisdiction of the United States to the extent that the State reserved the right to tax all property of any railroad or other corporation having a right of way or location over or upon the said lands." To this contention we must give our assent in view of the plain language of the statute. The reservation to tax is in general .terms and is not restricted to any particular form of tax. We think it is immaterial that the property was being delivered to an agency of the federal government where there is a fair and reasonable inference that the State had reserved the right to levy a tax upon it, whether it be an *ad valorem* tax or a privilege tax. It must be noted that the tax levied and collected in the instant case was for the privilege of using the public highways of the State. Where complainant had a right of way "over and upon" the lands in question, it cannot be said that the right of the State to tax ceased the moment the shipment reached its destination,

or that the power to tax at all was lost under the General Act of Cession.

The complainant is a private corporation and in conducting its business for profit has the free use of the public highways of this State. It has the right of way upon and over the lands in question by the grace of the legislature and will not be permitted to claim an exemption from taxation upon the ground that it is making deliveries of war material to plants that are being operated by the United States Government. *Penn Dairies, Inc.,* v. *Milk Control Comm.,* 318 U. S. 261, 63 S. Ct. 617, 87 L. Ed. 748.

In *Grayburg Oil Co.* v. *State* (Tex. Civ. App.), 286 S. W. 489, 494, the Court in discussing the question of jurisdiction by the United States over land ceded to it, said:

"While conceding the full grant of sovereignty for legislative and administrative purposes to the United States government over the territory thus ceded, we are unable to bring ourselves to the conclusion that the territory becomes wholly foreign to the state in matters of commerce, and that the transactions involved constituted interstate and not intrastate commerce."

The above case involved the sale of gasoline upon a federal reservation, namely, Fort Sam Houston.

In *State of Alabama* v. *King & Boozer et al.,* 314 U. S. 1, 62 S. Ct. 43, 45, 86 L. Ed. 3, it appears that King and Boozer, a partnership sold lumber to contractors for use by the latter for building an army camp for the United States. Under the Alabama law the state was required to collect a sales tax from the buyer. The Supreme Court of the United States held that the buyer was not immune from the tax, using the following language:

''Congress has declined to pass legislation immunizing from state taxation contractors under 'cost-plus' contracts for the construction of governmental projects. Consequently the participants in the present transaction enjoy only such tax immunity as is afforded by the Constitution itself . . . The Government rightly we think, disclaims any contention that the Constitution, unaided by Congressional legislation, prohibits a tax exacted from the contractors merely because it is passed on economically, by the terms of the contract or otherwise, as a part of the construction cost to the Government. So far as such a nondiscriminatory state tax upon the contractor enters into the cost of the materials to the Government, that is but a normal incident of the organization within the same territory of two independent taxing sovereignties. The asserted right of the one to be free of taxation by the other does not spell immunity from paying the added costs, attributable to the taxation of those who furnish supplies to the Government and who have been granted no tax immunity. So far as a different view has prevailed, see *Panhandle Oil Co.* v. [*Mississippi*], [and] *Graves* v. *Texas Co., supra* [298 U. S. 393, 56 S. Ct. 818, 80 L. Ed. 1236], we think it no longer tenable. See *Metcalf & Eddy* v. *Mitchell,* 269 U. S. 514, 46 S. Ct. 172, 70 L. Ed. 384; *Trinityfarm Co.* v. *Grosjean,* 291 U. S. 466, 54 S. Ct. 469, 78 L. Ed. 918; *James* v. *Dravo Contracting Co.,* 302 U. S. 134, 160, 58 S. Ct. 208, 221, 82 L. Ed. 155, 114 A. L. R. 318; *Helvering* v. *Gerhardt,* 304 U. S. 405, 416, 58 S. Ct. 969, 973, 82 L. Ed. 1427; *Graves* v. [*People of State of*] *New York,* 306 U. S. 466, 59 S. Ct. 595, 83 L. Ed. 927, 120 A. L. R. 1466.''

In addition to the foregoing authority we have the case of *Penn. Dairies, Inc.,* v. *Milk Control Comm., etc.,*

318 U..S. 261, 63 S. Ct. 617, 621, 81 L. Ed. 748, in which it was said:

"The trend of our decisions is not to extend governmental immunity from state taxation and regulation beyond the national government itself and governmental functions performed by its officers and agents. We have recognized that the Constitution presupposes the continued existence of the states functioning in coordination with the national government with authority in the states to lay taxes and to regulate their internal affairs and policy, and that state regulation like state taxation inevitably imposes some burdens on the national government of the same kind as those imposed on citizens of the United States within the state's borders, see *Metcalf & Eddy* v. *Mitchell* (269 U. S. 523, 524, 46 S. Ct. 172, 70 L. Ed. 392, 393). And we have held that those burdens, save as Congress may act to remove them, are to be regarded as the normal incidents of the operation within the same territory of a dual system of government, and that no immunity of the national government from such burdens is to be implied from the Constitution which established the system, see *Graves* v. *New York* [*supra*], 306 U. S. 466, 483, 487, 59 S. Ct. 595, 599, 601, 83 L. Ed. 927 [934, 937], 120 A. L. R. 1466."

The complainant is here seeking to invoke what it claims is the "exclusive jurisdiction" of the United States over certain army bases in order to escape the payment of a privilege tax to the State. We think the plea, if available, could only be made by the United States Government itself and not by the taxpayer. It does not appear that the Congress has, by appropriate legislation, declared complete sovereignty over these areas by the government, to the exclusion of the State's right to impose a tax upon transactions not beginning or ending

within such areas. In the instant case counsel for the defendant makes the pointed observation: "Such cession of jurisdiction as was made to the United States Government has never at any time been invoked by said government, either directly or indirectly, to protect this contract hauler from privilege taxation by the State."

Counsel for complainant (appellant) earnestly contends that the federal government "has the same powers over the lands in question as it has over the District of Columbia;" that its power is derived in the same manner and by virtue of the same authority, viz., Article 1, Section 8, Clause 17, of the Constitution of the United States. Clause 17 reads as follows:

"The Congress shall have Power . . . To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings."

The entire argument is based upon the erroneous assumption that the State of Tennessee has ceded "exclusive" jurisdiction over the lands in question. In *Standard Oil Co.* v. *State of California*, 291 U. S. 242, 245, 54 S. Ct. 381, 78 L. Ed. 775, cited as authority, the State of California ceded all authority over the "Presidio," a federal reservation. Now this being true, it was correctly held that the State could not levy and collect a tax upon transactions beginning and ending within such reservation. The case is not in point. Moreover, the insistence that the territory of the District of Columbia

is in the same status as an army camp not having a permanent existence, is entirely fallacious. The case of *Washington, Virginia & Maryland Coach Co.* v. *National Labor Relations Board,* 301 U. S. 142, 57 S. Ct. 648, 81 L. Ed. 965, also cited as authority, is not controlling for the same reason. There the question raised was that of transportation in interstate commerce. No denial was made but that the Coach Company was engaged in such commerce.

We judge from the pleadings and the opinion of the chancellor that the complainant was insistent upon two propositions: (1) that the State had ceded all jurisdiction over the lands in question; and (2) that the complainant was engaged in interstate commerce. It is now insisted in this Court that the "cases that are controlling . . . are based upon the question of exclusive jurisdiction." The two contentions are so inter-related that it is difficult to separate them. If the ceded territory occupies the status of a state or territory, of course the transaction here involved is one in interstate commerce. If the State of Tennessee has surrendered, or abdicated, all authority over such territory, ceding full legislative authority to the United States Government, the resultant effect is that such lands have ceased to be a part of the State of Tennessee—at least in a qualified sense.

■■■ In arguing the latter contention, counsel relies upon the following statement by the Supreme Court of the United States in *Standard Oil Co.* v. *California, supra* [291 U. S. 242, 54 S. Ct. 383], "A state cannot legislate effectively concerning matters *beyond her jurisdiction and within territory subject only to control by the United States.*" (Italics ours.) We do not think the State of Tennessee, under the General Act of Cession, has put the area in question beyond the operation of its

laws, as was done by Virginia and Maryland in ceding the territory of the District of Columbia to the United States, and that Williams' Code, section 1248.134, under Item C, is ineffective for the purposes for which it was enacted. In supporting the latter contention and thus permitting complainant to escape payment of the privilege tax imposed in the instant case, we would have to hold that the State has lost complete sovereignty over the lands in question, or that the commerce clause of the Constitution of the United States is applicable to shipments made to such army camps from points wholly within the geographical boundaries of the State. In other words, that these army camps are states within the meaning of the commerce clause of the Constitution. The first proposition is unsound and untenable, both as a matter of law and fact. The second cannot be maintained upon any reasonable hypothesis. The commerce clause, Article 1, Section 8, Clause 3, provides:

''The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.''

This section of the Constitution has been defined in many cases. We think the language used clearly contemplated transactions between citizens of different sovereign states. 11 Am. Jur., Commerce, 8 Sec. 4; 15 C. J. S. Commerce, Sec. 2, p. 258. Now if complainant's contention is carried to its ultimate conclusion, and is sound, the result would be that Tennessee has within its borders many small areas over which the Congress may confer certain attributes of sovereignty, or forever exercise its authority over them as against any right which the State itself may claim to have. As the learned chancellor pointed out in his opinion, this leads to an absurdity. He said:

"Counsel for defendant points to the serious nature of any decision which would subject to the rules of interstate commerce, transportation of goods or the movement of people to and from governmental reservations to other points in the state. He asks the question, 'Would a taxicab or bus running from Paris, Tennessee, to Camp Tyson, in the same county, be engaged in interstate commerce? And could there be a violation of the Mann Act [18 U. S. C. A., Sec. 397 et seq.] by escorting a female from the Nashville Post Office to another point in the City of Nashville?'

"When we consider the vast number of areas throughout the United States which have now come under the control of the Federal Government, we are brought to realize how far reaching such a holding might be."

The assignments of error are overruled and the decree of the chancellor is affirmed.