# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 21, 2014 Session

## JANE FIELD v. THE LADIES' HERMITAGE ASSOCIATION

**Direct Appeal from the Chancery Court for Davidson County**
**No. 07-783-II      Carol McCoy, Chancellor**

---

**No. M2013-02635-COA-R3-CV - Filed July 24, 2014**

---

This is the third round in a battle between these parties over the terms of a deed requiring certain payments to the heirs of the grantor. The property at issue is the historic Tulip Grove Mansion near The Hermitage, in Nashville, Tennessee. The deed conveying Tulip Grove to the Ladies' Hermitage Association required payments to the heirs of the grantor of one-third "of all gate receipts received by [the LHA] from visitors to Tulip Grove House[.]" In a prior appeal, we held that "the term 'gate receipts' in the deed includes the rent paid to LHA for use of the property for special events." The parties now dispute whether the LHA can deduct expenses from the special event rental fees prior to calculating the heirs' one-third share. The chancellor held that such a deduction is permissible. We hold that it is not. We therefore reverse and remand for further proceedings.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

W. Gary Blackburn, C. Dewees Berry IV, Nashville, Tennessee, for the appellant, Jane Field

Robb S. Harvey, Mark M. Bell, Nashville, Tennessee, for the appellee, The Ladies' Hermitage Association

**OPINION**

## I. FACTS & PROCEDURAL HISTORY

The Ladies' Hermitage Association ("LHA") is a non-profit organization that has been responsible for overseeing President Andrew Jackson's home, The Hermitage, and the surrounding property since 1889. The historic home known as Tulip Grove Mansion, constructed in 1836, is nearby the Hermitage. Tulip Grove was built by Andrew Jackson Donelson and his wife, Emily. Andrew Jackson Donelson was the nephew of Rachel Jackson (President Andrew Jackson's wife), and he served with President Jackson in different capacities.

Jane Berry Buntin and her husband bought the Tulip Grove property in 1914. In March of 1964, Ms. Buntin, who had been active in the LHA, conveyed the Tulip Grove house and surrounding property of 26.33 acres to the LHA in exchange for promises by the LHA to pay Ms. Buntin and her heirs certain monies. The warranty deed, dated March 11, 1964, contained the following provision:

> FOR AND IN CONSIDERATION of the sum of Ten Dollars ($10.00) cash in hand paid and other good and valuable considerations, hereinafter described, paid and to be paid by The Ladies' Hermitage Association, hereinafter called "GRANTEE" to Jane B. Buntin, hereinafter called "GRANTOR", receipt of all of which is hereby acknowledged and in addition, the said Grantee, by the acceptance of this Deed, agrees to pay to Grantor, her heirs and assigns, for a period of ninety-nine (99) years from and after March 1, 1964 one-third (1/3) of all gate receipts received by Grantee from visitors to Tulip Grove House located on said land, which payments are to be made on a monthly basis. If for any period of six (6) calendar months hereafter . . . Grantee should fail to pay to Grantor, her heirs and assigns, from such gate receipts or from other funds of Grantee at least $600.00 (except during such time as Tulip Grove House is being restored or rebuilt after fire or other casualty), then and in that event the title to the property herein conveyed shall revert to Grantor, her heirs and assigns, and this deed shall become null and void.

In subsequent years, Tulip Grove was restored by the LHA, and the LHA enjoyed success in charging visitors to view the house and grounds. From 1965 to 2001, the LHA paid to Ms. Buntin and her heirs over $300,000.00 out of the proceeds from the fees charged to admit people to the house. In 2001, however, the LHA determined that keeping the Tulip Grove house open for tours had become unprofitable, and it was closed to the general public. The LHA continued to pay the heirs at least $600.00 every six months.

After 2001, the LHA began using the Tulip Grove property in a technically different fashion by renting it to individuals or groups for use during "special events" such as wedding receptions or corporate dinners. The LHA did not pay to the heirs any portion of the receipts from these special events. The LHA began selling tickets specifically for the house again in 2008, and in 2010 there were enough profits from these tickets to pay Ms. Buntin's heirs an amount over $600.00 for each six months.

The plaintiff/appellant Jane Berry Field ("Plaintiff") is the granddaughter and heir of Jane Berry Buntin. In April of 2007, Plaintiff filed suit alleging the LHA had failed to comply with its obligations under the deed, and therefore, the property should revert to the heirs.[1] She also asked for a judgment against the LHA for the money that, she claimed, she should have been paid since 2001.

On November 12, 2008, the trial court entered an order on the LHA's motion for partial summary judgment and found that reversion was not warranted. This order was appealed by Plaintiff, and the sole issue on that appeal was whether the property had reverted to the heirs. This Court held that it had not because it was undisputed that the LHA had paid Ms. Buntin and her heirs at least $600.00 every six months. Therefore, we affirmed the November 12 order on the issue of reversion.[2] *See* **Field v. Ladies' Hermitage Ass'n**, No. M2008-02663-COA-R3-CV, 2010 WL 744527 (Tenn. Ct. App. Mar. 3, 2010) *perm. app. denied* (Tenn. Aug. 25, 2010) ("**Field I**").

On remand, the chancellor considered Plaintiff's claim for damages and held that the LHA did not have an implied obligation to keep the property open for paid tours and that the LHA did not have to share with the heirs the income derived from renting the property for special events. Specifically, the court concluded that "gate receipts" did not include rental of the house for special events. Plaintiff appealed again. On appeal, this Court found that the chancellor properly rejected the argument that the deed to the LHA contained an implied obligation to continue to generate gate receipts in order to pay a percentage to the grantor's heirs. However, to the extent that the LHA *was* admitting visitors to the property, albeit for "special events," we held that the heirs were entitled to a share of the rent paid to LHA for use of the property for these events. We explained:

---

[1] Although other heirs were also named as plaintiffs at various times during these proceedings by way of amended complaints, the claims of the other heirs were voluntarily dismissed, and Jane Berry Field is the sole remaining plaintiff.

[2] The trial court made findings pursuant to Rule 54.02 making the order on reversion immediately appealable. The other issues remained pending before the trial court, including whether the heirs were entitled to a monetary recovery from the LHA based upon its closure of the property in 2001 and its resulting failure to pay them one-third of gate receipts.

The Affidavit and deposition testimony of the current President and Chief Executive Officer of LHA showed that LHA had admitted visitors to the property for special events and that LHA had not shared any of the revenue with the Plaintiff. He said the special events included weddings, receptions, corporate dinners and other events. The typical charge for such use of the property was $1,100 for each event. By his interpretation of the deed, the obligation to share revenue with the grantor's heirs only extended to the sale of individual tickets to persons who toured the property because of their interest in its history and its contents. This interpretation mutually excludes rentals derived from special events where people attend because of the event and are otherwise uninterested in the property's history.

. . . .

Both parties agree that the language in the deed is plain and unambiguous. . . .

We are persuaded that the interpretation of the term "gate receipts" to mean only the sale of individual tickets is too narrow. The deed says "[a]ll gate receipts received by Grantee from visitors to Tulip Grove House on said land[.]" We see nothing in that language or the surrounding circumstances that indicate the parties intended to restrict the scope of LHA's obligation to money received from visitors who hold an individual ticket, or to money received from visitors who have an interest in history. We, therefore, hold that the term "gate receipts" in the deed includes the rent paid to LHA for use of the property for special events.

*Field v. Ladies' Hermitage Ass'n*, No. M2011-01736-COA-R3-CV, 2012 WL 5193368, at \*5-6 (Tenn. Ct. App. Oct. 19, 2012) ("*Field II*"). Having reversed the trial court's holding that the heirs were not entitled to a share of the special event income, we remanded for further proceedings on that issue.

After remand, Plaintiff filed a "Motion Concerning Special Event Revenues and Accounting," asking the trial court to order the LHA to pay the heirs of Jane Buntin their full share of revenues from wedding receptions, civic gatherings, and other so-called special events. In response, the LHA filed a "Motion for Approval of Certain Payments to Plaintiff, for Entry of Final Order, and for Satisfaction," claiming that it had attempted to pay Plaintiff $15,907.37 as the amount it believed was necessary to satisfy its obligations under the deed, yet Plaintiff had refused to cash the checks. The LHA conceded that, pursuant to this Court's opinion in *Field II*, Plaintiff was "entitled to some portion of the special event rentals." However, Plaintiff and the LHA disagreed as to how the heirs' one-third share of the event rentals should be calculated. The LHA calculated Plaintiff's one-third share based on what it called a "net calculation" of the amount of the event rental, which, it claimed, would

provide the heirs with one-third of the amount that the LHA "actually receives" from the rentals. The LHA explained that it "incurs additional expenses in order to make Tulip Grove House available for special event rentals," such as "state-imposed sales taxes on rental facilities and [] additional expenses for the cost to prepare, staff, and clean-up the special event." The LHA contended that Plaintiff should only receive one-third of "what is actually available" from the rental fee after the payment of these expenses. The LHA claimed that any other interpretation would lead to an "absurd" result, conceivably requiring it to pay Plaintiff a one-third share of refundable security deposits that the LHA temporarily held on behalf of renters.

In response, Plaintiff claimed that the heirs' one-third share should be based on the "gross" rental fees received by the LHA, without deducting expenses first. Plaintiff insisted that she was not attempting to collect any share of security deposits or sales taxes because she did not consider such sums to be a form of rent paid to the LHA.

Following a hearing, the trial court entered an order on November 8, 2013, adopting the interpretation espoused by the LHA. The trial court noted in the order that the LHA had attempted to pay Plaintiff a share of the "income derived from special events net of expenses." Without explanation, the trial court held, "Consistent with the terms of the Warranty Deed and the intent of the parties, the Court holds that the heirs (collectively) should receive 1/3 of (a) the gate receipts from ticketed visitors at Tulip Grove House, plus (b) the actual payments for special events held in Tulip Grove House after deducting event-related expenses."[3] Plaintiff timely filed a notice of appeal.

---

[3] Tennessee Rule of Civil Procedure 52.01 requires trial courts to make specific findings of fact and conclusions of law in all bench trials. "[F]indings and conclusions facilitate appellate review by affording a reviewing court a clear understanding of the basis of a trial court's decision." *Lovlace v. Copley*, 418 S.W.3d 1, 34 (Tenn. 2013); *see also* *In re K.H.*, No. W2008–01144–COA–R3–PT, 2009 WL 1362314, at *8 (Tenn. Ct. App. May 15, 2009) (recognizing that without findings and conclusions appellate courts are left to wonder about the basis of a trial court's decision). In the case before us, the chancellor's order recites some undisputed facts, regarding the LHA's attempts to pay Plaintiff, and Plaintiff's refusal to cash the checks. However, there are no findings or conclusions to explain why she interpreted the deed as allowing the LHA to deduct expenses prior to paying Plaintiff. She simply stated that the LHA was allowed to deduct event-related expenses, "[c]onsistent with the terms of the Warranty Deed and the intent of the parties." Although we would have preferred some explanation that would have allowed us to understand the reason for the trial court's decision, the interpretation of the deed is an issue of law, which we review *de novo*, and the facts are largely undisputed. Therefore, we will proceed to consider the issues on appeal regardless of the lack of detailed written conclusions by the chancellor.

## II.  ISSUE PRESENTED

Plaintiff presents the following issue for review on appeal: Whether the LHA is entitled to deduct expenses before calculating the heirs' share of revenues from so-called special events.  For the following reasons, we reverse the decision of the chancery court and remand for further proceedings.

## III.  STANDARD OF REVIEW

As we explained in *Field I*, construction of a deed is a question of law.  2010 WL 744527, at *3 (citing *Griffis v. Davidson County Metro. Gov't*, 164 S.W.3d 267, 274 (Tenn. 2005)).  Conclusions of law are reviewed *de novo* with no presumption of correctness.  *Id.* (citing *Griffis*, 164 S.W.3d at 274).  "In construing a deed, our primary task is to ascertain the grantor's intent from the words of the deed as a whole and from the surrounding circumstances."  *Griffis*, 164 S.W.3d at 274 (citing *Collins v. Smithson*, 585 S.W.2d 598, 603 (Tenn. 1979); *Bennett v. Langham*, 214 Tenn. 674, 383 S.W.2d 16, 18 (1964)).

## IV.  DISCUSSION

We begin our analysis with the words of the deed itself.  It required the LHA to pay to Ms. Buntin and her heirs "one-third (1/3) of all gate receipts received by Grantee from visitors to Tulip Grove House located on said land[.]"  Next, we must examine our prior holdings regarding the language at issue.  In *Field II*, we rejected the narrow interpretation of "gate receipts" urged by the LHA that would not include special event rental income within the meaning of gate receipts.  We noted that the deed says "[a]ll gate receipts received by Grantee from visitors to Tulip Grove House on said land," and we found nothing in that language or the surrounding circumstances to indicate that the parties intended to restrict the scope of the LHA's obligation to money received from visitors who held an individual ticket or who had an interest in history.  We, therefore, held that the term "gate receipts" in the deed includes "the rent paid to LHA for use of the property for special events."

On appeal, Plaintiff asserts that expenses should not be deducted prior to calculating the heirs' share of special event rental fees, pointing, again, to the deed's broad language, providing the heirs with a one-third share of "*all* gate receipts received by Grantee from visitors to Tulip Grove House." (Emphasis added).  She also points to this Court's previous holding that "gate receipts" includes "*the rent paid to LHA* for use of the property." (Emphasis added).  The LHA, on the other hand, focuses on the deed's use of the term "received" in the phrase "gate expenses *received* by Grantee from visitors to Tulip Grove House."  (Emphasis added). The LHA claims that it "merely serves as a conduit" for some of the rental fee because it is required to pay money to the State for taxes, and it uses other

portions of the rental fee to pay third parties to adequately prepare, staff, and clean-up for the special events. Thus, the LHA claims that it only "temporarily receives" the funds that ultimately are used for expenses, and it contends that the deed only requires it to pay to the heirs one-third of the amount of rental fees that it "receives" and "actually keep[s]."

We are not persuaded by the LHA's assertions. A plain reading of the language of the deed requires the LHA to pay to the heirs a one-third share of *"all gate receipts received by [the LHA] from visitors* to Tulip Grove House[.]" (Emphasis added). In our view, this language unambiguously requires that the payment be calculated based on the total amount of the receipt or rental payment received from visitors, not the amount of the receipt that the LHA "actually keeps" after it pays expenses. There is nothing in the language of the deed or the surrounding circumstances to indicate that the parties intended to allow the LHA to deduct expenses from "all gate receipts" prior to paying Ms. Buntin and her heirs their one-third share. "In Tennessee, 'receipt' has been defined as the '[a]ct of receiving; also, the fact of receiving or being received. That which is received; that which comes in, in distinction from what is expended, paid out, sent away, and the like.'" ***Mr. Transmission, Div. of Intern. Transtech Corp. v. Yount***, No. 88-43-II, 1988 WL 53339, at \*5 (Tenn. Ct. App. May 27, 1988) (quoting *State ex rel. v. Texas Co.*, 173 Tenn. 154, 158, 116 S.W.2d 583, 584 (1938)). The fact that the LHA may ultimately decide to spend a portion of the receipt it receives from special events to pay expenses, rather than using its funds on hand, does not mean that the rental fee was not a "gate receipt" when received.

The deed simply requires payment of one-third of all gate receipts received, or coming in, from visitors, including those visitors who visit the property for special events. The parties to the deed were sophisticated and knowledgeable and they were represented by two of the leading law firms in the city. As we said in ***Field II***, "The individual lawyers involved in the transaction would have made a short list of the city's well-known and respected practitioners." It is doubtful that they would have chosen language providing the heirs with a share of "all gate receipts received by [the LHA] from visitors" if they had truly intended for the heirs' share to be calculated based upon the gate receipts ultimately "kept" by the LHA, or the gate receipts remaining after the deduction of expenses.

The course of dealing between the parties also illustrates that they did not intend for the LHA to deduct expenses prior to calculating the heirs' one-third share of the gate receipts. As noted earlier, between 1965 and 2001, the LHA paid to Ms. Buntin and her heirs over $300,000.00 out of the proceeds from the fees charged to admit people to the house. It is undisputed that the LHA did not deduct expenses from those individual gate receipts

prior to calculating the heirs' one-third share.[4]

The LHA argues on appeal that if it is required to pay the heirs their one-third share "off the top" of the rental fee, then it is conceivable that the LHA could, after the payment of expenses, receive less money for a special event rental than the heirs. The LHA argues that this is an absurd result and that it could lead the LHA to discontinue renting the Tulip Grove House for special events in the future or even to close Tulip Grove to public access completely. While that decision would be unfortunate for all of the parties involved and the citizens of Tennessee, we are constrained by the plain language of the agreement, and we cannot rewrite the language of the deed because of the claimed harshness of the result. *See Baptist Memorial Hosp. v. Argo Const. Corp.*, 308 S.W.3d 337, 345 (Tenn. Ct. App. 2009) ("this Court cannot rewrite the parties' contract because its terms later prove to be burdensome").

The LHA also argues on appeal that its interpretation of the deed should be adopted by this Court because we recognized in *Field II* that Ms. Buntin was likely acting, at least in part, with a donative intent when she entered into this transaction with the LHA. In *Field*

---

[4] The record before us includes a transcript of the chancellor's oral remarks at the hearing on remand, although the trial court's final order does not refer to the transcript or incorporate it by reference. Still, the transcript does shed some light on the apparent reason for the chancellor's ruling in favor of the LHA. The chancellor stated:

> This Court is aware that the term "rental income," as used by accountants, at that time, does not equate to gross revenues. Ms. Field is entitled to one-third of the rental income at Tulip Grove for all special events. The term "rental income" is not gross revenues. I don't think I can be any clearer than that.
> . . . .
> . . . Because I see the use of accounting terms in the court opinion -- Court of Appeals opinion to reflect an attitude that she's entitled to one-third of the income. There's also a recognition that there are going to be expenses incurred. There are no deductions from the gate receipts for expenses because that's built into what they're doing. It's built into it.
> When you have a special event, they are one-time charges. They are not built into the rent. . . .

This Court's precise holding in *Field II* was that "the term 'gate receipts' in the deed includes *the rent paid* to LHA for use of the property for special events." *Id.* at *6 (emphasis added). Although the Court did refer to the parties' dispute over the issue of "special event income" and "rental income" in other sections, including the introduction to the opinion and in our discussion of the issue of res judicata, this language was not meant to suggest that Plaintiff was only entitled to a share of the "income," in the sense of profit, that the LHA earned from special events. More importantly, the deed does not use the term "rental income" but rather "all gate receipts." We must look to the deed in order to determine whether the parties intended for expenses to be deducted prior to paying the heirs.

-8-

*II*, in the context of deciding whether to read an *implied* obligation into the deed that would require the LHA to continue to generate gate receipts in order to pay the heirs a one-third share of those receipts, we listed a number of reasons why such an implied obligation should not be found in the present case, and we concluded by stating:

> Finally, to infer that the parties to the deed had an unexpressed intent to maximize the return to the grantor and her heirs would treat this transaction as a commercial arms-length deal free of any donative intent on the part of the grantor. The grantor, however, served as a board member of LHA from 1939 to 1954. Her daughter-in-law served on the board from 1954 to 1983 and served as Regent of LHA from 1965 to 1969. The grantor's son and daughter-in-law actually lived at Tulip Grove during the time when the transfer was being negotiated. It would be easier to draw an inference that a wish to preserve Tulip Grove as part of the Hermitage was a substantial part of the consideration for the transfer.

The LHA now argues on appeal that this finding of a likely donative intent is "the law of the case." However, our previous recognition of Ms. Buntin's donative intent does not require us to rule in the LHA's favor on the issue before us. Ms. Buntin's donative intent was more relevant when we were deciding whether to read into the deed an *implied* obligation to continuously generate gate receipts. However, here, we are interpreting an *express* term of the parties' agreement, by which the LHA expressly agreed to pay the heirs one-third of all gate receipts it received from visitors. Ms. Buntin's donative intent does not require a different interpretation of this clear language, and we will not read into the deed a provision allowing for the deduction of expenses where no such language exists. We also note that while *Field II* recognized the likelihood that Ms. Buntin's donative intent was "a substantial part" of the consideration for the transfer, the Court did not find or even suggest that Ms. Buntin was solely motivated by charity. She obviously provided a source of income for her and her heirs for ninety-nine years, and she provided that the property would revert to the heirs if payments ceased. Notably, in *Field II*, the Court went on to hold that "gate receipts" was broad enough to encompass income from special event rentals, despite its previous statements about Ms. Buntin's donative intent.

Finally, we note that the LHA continues to argue on appeal that the position taken by Plaintiff would require it to pay to Plaintiff one-third of all refundable security deposits and sales taxes. However, Plaintiff has made it clear, before the trial court and again on appeal, that she is not seeking a one-third share of the security deposits or the sales taxes because she does not consider those charges to be "gate receipts." Consequently, there is no controversy as to those specific charges, and we will not address them further on appeal.

## V.   CONCLUSION

For the aforementioned reasons, the decision of the chancery court is hereby reversed and remanded for further proceedings to include a determination of the amount owed to Plaintiff for her share of the "gate receipts" received by the LHA in the form of special event rentals.  In making this calculation, the LHA is not entitled to deduct expenses prior to determining the heirs' one-third share.  Costs of this appeal are taxed to the appellee, the Ladies' Hermitage Association, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.